UNITED STATES *v.* CLAY ADAMS CO., INC. (No. 3968)[1]
CLAY ADAMS CO., INC. *v.* UNITED STATES (No. 3969)

United States Court of Customs and Patent Appeals, November 2, 1936

*Joseph R. Jackson*, Assistant Attorney General (*Ralph Folks* and *Marcus Higginbotham, Jr.*, special attorneys, of counsel), for the United States.

*Curie, Lane & Wallace* (*Samuel Isenschmid* of counsel) for Clay Adams Co., Inc.

[1] T. D. 48625.

[Oral argument October 8, 1936, by Mr. Folks and Mr. Isenschmid]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GRAHAM, Presiding Judge, delivered the opinion of the court:

Glass was imported at the port of New York by the appellant, under the Tariff Act of 1930. It was assessed for duty by the collector at 50 per centum ad valorem under paragraph 230 (d) of said tariff act, as "All glass, and manufactures of glass, * * * not specially provided for." The importer protested, claiming the merchandise to be dutiable under paragraph 1555 of said act as "waste, not specially provided for," or, alternatively, as "Cylinder, crown, and sheet glass," at 1⅛ cents per pound, under paragraph 219 of said act. There was also an alternative claim under the nonenumerated manufactures paragraph, 1558, of said act.

The United States Customs Court sustained the protest under said paragraph 219, and in the opinion filed based this decision upon the finding that, under the evidence, the material was crown glass. The other claims under said paragraph 219 were rejected, the court being of opinion that the imported glass was not sheet or cylinder glass.

The Government appealed, insisting that the classification made by the collector was correct, or that, if not correct, the merchandise was dutiable as scientific glass articles at 85 per centum ad valorem, under paragraph 218 (a) of said act. The importer filed a cross appeal, alleging that the court below erred in not finding and holding that said glass is sheet glass within the meaning of that term in said paragraph 219.

The relevant portions of the paragraphs involved are as follows:

PAR. 230. (d) All glass, and manufactures of glass or of which glass is the component of chief value, except broken glass or glass waste fit only for remanufacture, not specially provided for, 50 per centum ad valorem.

PAR. 1555. Waste, not specially provided for, 10 per centum ad valorem.

PAR. 218. (a) Biological, chemical, metallurgical, pharmaceutical, and surgical articles and utensils of all kinds, including all scientific articles, and utensils, whether used for experimental purposes in hospitals, laboratories, schools or universities, colleges, or otherwise, all the foregoing (except articles provided for in paragraph 217 or in subparagraph (e)), finished or unfinished, wholly or in chief value of glass, 85 per centum ad valorem; wholly or in chief value of fused quartz or fused silica, 50 per centum ad valorem.

PAR. 219. Cylinder, crown, and sheet glass, by whatever process made, and for whatever purpose used, not exceeding one hundred and fifty square inches, 1⅛ cents per pound; * * * Provided, That none of the foregoing weighing less than sixteen ounces but not less than twelve ounces per square foot shall be subject to a less rate of duty than 50 per centum ad valorem: Provided further, That cylinder, crown, and sheet glass, imported in boxes, shall be denied entry unless packed in units containing fifty square feet or multiples thereof, as nearly as sizes will permit, and the duty shall be computed thereon according to actual weight of glass.

The importer's claim under paragraph 1555 is not pressed, its claim being based exclusively upon said paragraph 219 as crown, or, alternatively, sheet glass.

On the hearing before the United States Customs Court, two witnesses were called and examined on behalf of the importer, Arthur W. Lamm, secretary, treasurer, and director of the importer, and Ferdinand Schurman, president of Fish-Schurman Corporation, purchasers and sellers of glass specialties, and the like. The witness Lamm identified the imported merchandise, a case of which was introduced in evidence, and described it as sheets of glass, in thickness from .12 to .17 millimeters, and stated that it was imported and used by the importer for the exclusive use of being cut into miscroscope cover glasses. For this use it is cut into small squares after importation, and sold in one-half ounce quantities in small boxes. Some of these manufactured cover glasses were also introduced in evidence.

The witness Schurman testified that his firm had been in business since 1923, importing and selling the goods in question. He stated that in July or August 1934, he had been in the factory of the Deutsche Spiegelglas A/G, in Grunenplan, Germany, and had watched the process of manufacture of glass identical with that here imported. He thus described the process of making the glass:

The liquid glass was taken out of the hafen, (German) put on the end of a blowpipe, and then a ball was blown out of this raw material. The size of the ball depends on how thin the glass is going to be made. The larger the ball, the thinner the glass.

*       *       *       *       *       *       *

After the ball is made, heat is applied from all sides, and the blowpipe is rotated. The heat makes the glass soft, sufficiently soft so that by rotating the blowpipe the centrifugal force elongates the ball to a certain extent, that finally the bottom of this elongated ball is a complete, flat sheet. Thereafter, through some means, the bottom is cracked off the blowpipe and it falls onto a felt.

Afterwards this witness was interrogated, and answered as follows:

Q. Now, Mr. Schurman, based upon your general experience in the glass business, and also based upon your observation of the method of production of the glass represented by Exhibit 1, will you please state to the court what in your opinion Exhibit 1 is?—A. This is a blown sheet glass made according to the crown process.

This witness also stated on cross-examination that the blown ball is expanded to a diameter of about 40 to 50 inches; that it loses its shape as a ball in the process, and comes out in a flat sheet; that by means of a "wire or something" the bottom cracks off and falls down on a felt; that the upper part of the flattened ball is not used, because of the crown in the center of this portion at which the blowpipe is attached.

The witness further stated that this glass was used for cover glasses, and also for the covering of mirrors, in cheap jewelry, and in the

making of polariscope glasses. He stated, however, that he thought the chief use was for making microscope cover glasses.

On behalf of the Government, eight witnesses were called. It seems necessary to review the testimony of some of these witnesses briefly:

Antonio Rottino, a physician, stated that the imported material was cover glass and used to make cover glasses for microscopes.

Edwin S. Popper, an importer of glass for fifty years, testified that sheet glass was the ordinary term used in describing window glass. He also introduced and identified a piece of what he denominated plate glass. He further stated that approximately 90 per centum of sheet glass is used in windows, and that the material imported here was not sheet glass but was commonly called "microscopic glass." He expressed the opinion that the imported glass was "like what is known as German plate glass; and then again, what is known today as drawn glass"; that sheet glass is "a glass in convenient sheets that can be cut into convenient sizes for special purposes like windows, and it is used in connection with window glass, whether white or colored, or any other kind of glass"; that cylinder glass is blown in the shape of a cylinder and then flattened out, after which it becomes a sheet of glass. This witness stated that he had seen the imported glass made into large balls and then broken up and put into a flattening furnace and expressed this opinion: "I don't believe it is possible to make it by the crown process." He further stated that the crown process is practically obsolete, but that such glass was made "once in a while"; that said glass could not be made by the crown process.

The witness Dudley Onderdonk, district sales manager for the American Window Glass Co., of Pittsburgh, Pa., manufacturers of glass, stated that sheet glass in the trade meant window glass.

Max Meyer, in the laboratory supply business for forty years, testified that he had bought the imported merchandise as cover glass, and that it was used to make cover glasses for microscope slides; that window glass is usually known as sheet glass, and that the imported glass was used and sold as cover glasses for microscope purposes.

Charles Russell Haag testified that the imported glass was used to cover microscopic specimens on slides, and that it was used in laboratories after being cut up into small pieces.

Irving Banner, connected with a laboratory equipment house in New York City, testified that the imported material was glass intended for microscope cover glasses, and that it was sold for that purpose; that this was its chief use, amounting to probably 99.9 per centum of all its uses.

The witness Edward J. Dougherty, a customs agent, had obtained from the importer's office in New York, an order for some of the mate-

rial imported here, which order, together with a translation thereof from German to English, is in evidence. This trial order, known as Exhibit 2, recites thereon, under the head of description of goods, "Raw Sheet Glass."

It will be observed from this résumé of the testimony in the record that the only testimony which appears therein as to the method of manufacture of the imported goods is given by the witness Schurman, who stated that the imported merchandise is sheet glass produced by the crown process. There is no evidence in the record to indicate that this is cylinder glass, and none to indicate that it is sheet glass except this statement of Schurman, which has been referred to above.

It is unnecessary, in view of our conclusion herein, to consider the cross appeal and the claims made therein.

There is no denial from any source that the witness Schurman correctly detailed the process of making the imported merchandise. The witness Popper was of opinion that the glass could not have been made by the crown process, but the fact remains that the witness Schurman saw the process of making, and that the correctness of his testimony is not in any way impeached or denied. It would seem, therefore, that the process detailed by him should be accepted as the process used in making the imported material.

Webster's New International Dictionary, 1932, thus defines crown glass:

1. Window glass blown and whirled into the form of a disk, in the center of which is a knot, called the *bull's-eye*, left by the worker's rod. Panes cut from it are brilliant but small and uneven, and, though formerly in almost universal use, are now manufactured for occasional decorative purposes only.

A New English Dictionary, 1893, thus defines crown glass:

Crown-glass. A kind of glass composed of silica, potash, and lime (without lead or iron), made in circular sheets by blowing and whirling.

It is the sort commonly used in Great Britain for windows, and the best quality is used in combination with flint glass to render dioptric instruments achromatic.

1706 Phillips (ed. Kersey), *Crown-glass*, the finest sort of Glass for Windows. 1718. *Freethinker* No. 95.283 A poor Barber..had above Fifty Shillings Worth of Crown-Glass demolished. 1758 Dollond in *Phil. Trans.* L. 740 The crown glass seems to diverge the light rather the least of the two. 1807. T. Thomson *Chem.* (ed. 3) II. 508 Crown-glass is made without lead. It is therefore much lighter than flint-glass. 1881. *Every Man his own Mechanic* §1678 Crown glass is circular in form with a thick lump called a bull's-eye in the centre.

Knight's American Mechanical Dictionary, p. 650, thus defines crown-glass:

Crown-glass. Glass made by blowing and whirling, changing the ball of glass into a globe and eventually into a disk attached to the end of the *ponty*. Window-glass is made in this manner. Crown-glass is a finer variety, a compound of silicate of potash, or soda, and silicate of lime,—silica, 63; potash, 22; lime, 12; alumina, 3. * * *

Crown-glass is made in round disks by the following process:——

The materials are fritted in a reverberatory furnace, and then melted in a pot. A lump of glass sufficient to make a *table* of nine pounds weight is extracted at the end of a *blowing-tube*, and is distended into a pear shape by blowing through the tube and rolling on the *marver*, which is a cast-iron slab on a stand. Being softened by heat at the mouth of a small blowing-furnace, it is rolled on the *marver* and blown till it assumes a more spherical shape, but has a conical end, which is removed as the glass approximates a spherical form, being blown as it is rolled on the *bullion-bar*. Being again heated at the blowing-furnace, rotation and blowing being persevered in, it becomes spherical. It is then presented at a larger furnace-hole called the *bottoming-hole*, and being rapidly rotated becomes oblate. A *pontil* tipped with molten glass is then applied to the center of the flat portion, and the blowing-tube is detached by touching the neck of the globe with a cold wet iron. This leaves a hole in the end from which the blowing-tube was detached, and the article appears as shown at the right-hand upper corner.

Heat and rotation being still applied, first at a furnace-opening of moderate size called the *nose-hole*, and then at a much larger one called a Flashing-Furnace (which see), the hole becomes more and more enlarged as the article becomes more and more oblate. Finally it flies open with a sharp rustling noise, and appears as a flat plate, called a *table*, adhering at its central, thicker portion, the *bull's-eye*, to the *pontil*, by which, during the latter portions of the process, it was rested on the hook in the half-wall before the furnace, which formed a partial screen for the workman.

When it has cooled sufficiently to be rigid and not liable to bend or collapse, it is placed on a fork, the *pontil* detached by the application of a cold iron, and the *table* placed in the annealing arch or kiln, where is rests on it edge for perhaps twenty-four hours, gradually cooling. * * *

The size of a *table* or disk of crown-glass is about 52 inches, and a pot holding one half-ton will make about 100 tables.

The process described by the witness Schurman accords with the definitions given by these authorities and we, therefore, conclude that the trial court was not in error in finding that upon the record the imported material was and is crown glass.

The Government contends that, because of its use for microscope cover glasses, the imported material should be classified as scientific articles under said paragraph 218 (a). However, it will be observed that said paragraph 219 makes use immaterial, for it recites therein, "for whatever purpose used." We conclude, therefore, that the provision in said paragraph 219 for "crown glass" more specifically describes the imported goods than does the language in said paragraph 218 (a), "scientific articles."

Finding no error in the judgment of the trial court, it is *affirmed*.